**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DAVID WICHTERMAN, JR., as Administrator of the Estate of Daniel Wichterman, deceased,** <br>         **Plaintiff,** | **CIVIL ACTION** |
| **v.** | **NO. 16-5796** |
| **CITY OF PHILADELPHIA, CORIZON HEALTH, POLICE CORRECTIONAL OFFICER JUSTIN AVERY, POLICE CORRECTIONAL OFFICER WILLIAM GWALTHNEY, TAIRU WAHABU, RN, and, OFFICER JOYNER, BADGE NO. 114,** <br>         **Defendants.** | |

**DuBois, J.**                                           **June 19, 2019**

# M E M O R A N D U M

## I.    INTRODUCTION

On January 30, 2015, Daniel Wichterman died while in custody of the Philadelphia Police Department. Wichterman allegedly suffered an opioid overdose in a holding cell at the City of Philadelphia Police Detention Unit ("PDU") after being arrested on suspicion of driving under the influence of narcotics. Plaintiff David Wichterman, Jr., the Administrator of the Estate of Daniel Wichterman, and his brother, commenced this action on November 9, 2016. The following claims are asserted: a Fourteenth Amendment claim under 42 U.S.C. § 1983 against Police Correctional Officers Justin Avery, William Gwalthney, and Lavern Joyner, and a nurse stationed at the PDU, Tairu Wahabu, R.N.; a *Monell* claim against the City of Philadelphia; and state law negligence claims against Wahabu and Corizon Health, Inc (collectively, the "Corizon defendants").

Presently before the Court are Corizon defendants' (1) Motion to Exclude the Expert Testimony of Robert L. Cohen, M.D., and (2) Motion to Exclude Testimony of Sarah E. Wakeman, M.D. For the reasons that follow, the Motions are granted in part and denied in part.

## II.  BACKGROUND[1]

### A.  Accident, Arrest, and Intake

On January 30, 2015, Daniel Wichterman was arrested on suspicion of driving under the influence ("DUI") after he was involved in a minor automobile accident. City Def. Stmt. of Undisputed Material Fact ("City SUMF") ¶¶ 7, 20. At approximately 3:00 p.m., two police officers, Officer Gregory Sulock and Officer Richard Greger responded to the accident. *Id.* at ¶ 8. Wichterman informed both Sulock and Greger that he had taken heroin. *Id.* at ¶¶ 12, 17. Both officers observed that Wichterman appeared intoxicated but testified that they did not believe he was in a state of overdose. *Id.* at ¶¶ 13, 14, 15, 21, 23. After Officer Greger determined that there was probable cause for a DUI charge, Wichterman was transported to the PDU. *Id.* at ¶¶ 20, 24; Corizon Stmt. of Undisputed Material Facts ("Corizon SUMF") ¶ 7.

Wichterman arrived at the PDU at approximately 5:33 p.m., on January 30, 2015, at which point he was searched and escorted to the Accident Investigation Division ("AID"). City SUMF ¶¶ 28, 39. The AID Officer on duty, Officer Patrick Farrell, interviewed Wichterman from approximately 5:40 p.m. to 6:12 p.m. *Id.* at ¶ 40; Pl.'s Statement of Facts ("Pl. SOF") ¶ 67. Farrell observed that Wichterman had constricted pupils, slow speech and movements, and a raspy voice. City SUMF ¶ 41. After conducting the interview, Farrell walked Wichterman to the nurse's station so that a blood draw could be performed to test for narcotics. *Id.* at ¶ 46.

---

[1] In this Memorandum, the Court includes only those facts necessary to explain its decision.

## B. Medical Screening by Nurse Wahabu

The nurse stationed at the PDU on January 30, 2015, was defendant Tairu Wahabu, who was employed by defendant Corizon Health, a private company which provides medical services to the PDU. *Id.* at ¶ 5–6; Corizon SUMF ¶ 2. Wichterman's intake with Wahabu was recorded on video. Corizon SUMF ¶ 4.

Wahabu began Wichterman's evaluation by taking his vital signs which Wahabu testified were "perfect." City SUMF ¶¶ 50, 51. Next, Wahabu drew Wichterman's blood. Farrell Dep. 90:21–91:23; City SUMF ¶ 72. Officer Farrell, who was present for the blood draw, retrieved the blood sample and returned to his office. Farrell Dep. 96:14–97:15.

After Officer Farrell left, Nurse Wahabu began conducting Wichterman's intake screening by filling out a "receiving screening form" as required by Corizon policy. Pl. SOF ¶ 76. In response to question 4 on the screening form which asked: "Does the inmate appear to be under the influence of, or withdrawing from[,] drugs or alcohol[?]", Wahabu circled "Y" for "yes." *Id.* at ¶ 78. Next to that question Wahabu wrote the word "Klonopin." *Id.* Wahabu testified that, despite his affirmative answer to question 4, Wichterman did not actually appear to be under the influence of any drug. *Id.* at ¶ 79. Wahabu explained that he answered "yes" to that question because Wichterman told him he took Klonopin for his anxiety. Wahabu Dep. 174:9–18. Wahabu also answered "yes" to questions 6 and 7 which asked about treatment for health conditions including use of prescription medication. Pl. SOF ¶ 81.

For the remaining questions Wahabu selected "N" for "no." *Id.* at ¶¶ 82–83, Ex. 12A. However, Wahabu did not circle responses for each question individually. Wahabu circled "N" individually in response to questions 8 through 13 but simply drew a single straight line through all "N" responses for questions 14 through 21, including question 15, which asked "Do you use

drugs?" *Id.* at ¶¶ 82–83, Ex. 12A. Wahabu testified that he asked Wichterman whether he used "any street drugs – heroin, crack, everything," and Wichterman answered "no, he hadn't used anything like that." *Id.* at ¶ 86.

In contrast to Farrell's observations, Nurse Wahabu testified that he saw no signs of physical illness or intoxication when Wichterman was in his presence. *Id.* at ¶ 90. Wahabu explained that if he noticed any of the symptoms described by Farrell – constricted pupils, lethargic speech, lethargic movements, or a raspy voice – in a detainee like Wichterman, he would have immediately sent the detainee to the hospital. *Id.* at ¶ 95.

Wahabu was familiar with how to recognize and treat an opiate overdose. *Id.* at ¶ 23. Narcan, a drug that is often successful in reversing the effects of an opiate overdose, was available in the PDU at the time of Wichterman's arrest. *Id.* Wahabu testified that he had experience treating detainees with Narcan and estimated that he had administered Narcan approximately fifty times to detainees who appeared to be overdosing. *Id.*

As the PDU's registered nurse, Wahabu has discretion to determine where detainees are sent after conducting their intake screening. City SUMF ¶ 59. At the end of Wichterman's screening, Wahabu decided that neither emergency medical care nor specialized observation was necessary and sent Wichterman to the general PDU population. *Id.* at ¶ 60.

### C. The Cell Block

After the medical screening, Wichterman arrived on the cell block at approximately 6:17 p.m. Pl. SOF ¶ 121; City SUMF ¶ 62. The two Police Correctional Officers ("PCOs") assigned to the cell block at the time were defendants Justin Avery and William Gwalthney. City SUMF ¶ 64. Both Avery and Gwalthney testified that they had no concerns about Wichterman's health or safety at the time he arrived on the cell block. *Id.* at ¶¶ 71, 73. Wichterman was placed in cell

#2 with another detainee, Michael Panichelli. *Id.* at ¶ 74. From 6:17 to 10:15 p.m. Wichterman remained in his cell. During those four hours Avery and Gwalthney walked up and down the corridor a number of times, but neither physically entered Wichterman's cell until after 10:00 p.m. *Id.* at ¶¶ 76, 79.

Defendant PCO Lavern Joyner was also on duty at the time, working as a fingerprint technician. *Id.* at ¶ 65. Joyner attempted to retrieve Wichterman for fingerprinting twice, once at 8:26 p.m. and again at 8:56 p.m. *Id.* at ¶¶ 80, 83. Joyner testified that when she attempted to wake Wichterman she opened the door to cell #2, called his name once or twice, received no response, shut the door, and left the cell block. *Id.* at ¶ 81. She further testified that she believed that Wichterman was sleeping and did not have any concerns about Wichterman's health or safety. *Id.* at ¶ 82. In contemporaneous notes Joyner wrote that Wichterman was "knocked out," "would not move," and that he was "sleeping hard." Joyner Dep. 40:13–41:3, 45:5–20.

At approximately 10:15 p.m., Wichterman's cellmate, Panichelli informed Gwalthney that something might be wrong with Wichterman. City SUMF ¶ 91. Avery and Gwalthney entered Wichterman's cell, attempted unsuccessfully to wake him, and then called Wahabu for help. *Id.* at ¶¶ 93, 94. At 10:18 p.m. Wahabu arrived at Wichterman's cell, began CPR, and instructed the PCOs to call 911. *Id.* at ¶ 94–95.

Wichterman was pronounced dead at 11:31 p.m. *Id.* at ¶ 97. His Autopsy and Toxicology Report stated that his cause of death was drug intoxication as a result of an opioid overdose. *Id.* at ¶ 98; Corizon SUMF ¶ 25. The parties dispute whether Wichterman consumed the fatal dose of heroin before or after arrival at the PDU. Corizon SUMF ¶ 26.

### D. Procedural Background

On November 10, 2017, plaintiff, as Administrator of Wichterman's Estate, filed an Amended Complaint (Document No. 29). The Amended Complaint asserts claims of (1) deliberate indifference against the individual defendants under the Eighth and Fourteenth Amendments, (2) violations of Wichterman's rights under the Eighth and Fourteenth Amendments by the City of Philadelphia and Corizon Health, and (3) and state law negligence claims against Corizon defendants. The Eighth Amendment claims were later abandoned on the ground that Wichterman, as a pretrial detainee, had no rights under the Eighth Amendment. Pl. Consol. Resp. 2 n. 2. Likewise, Plaintiff has abandoned his municipal liability and corporate negligence claims against Corizon as set forth in Counts Two and Three of the Amended Complaint. Pl. Consol. Resp. 2 n. 3. However, he maintains his negligence claim for vicarious liability against Corizon based on Wahabu's conduct. *Id.*

On May 30 and May 31, 2018, respectively, Corizon defendants filed a Motion to Exclude the Expert Report of Robert L. Cohen, M.D, and a Motion to Exclude the Expert Testimony of Sarah E. Wakeman, M.D. (Document Nos. 37, 39). Both Motions are fully briefed and ripe for decision.

## III. LEGAL STANDARD

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

That rule requires the Court to act as a gatekeeper and is applicable to scientific testimony and testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co., Ltd. v.*

*Carmichael*, 526 U.S. 137, 141 (1999). A court must determine whether an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Rule 702 has a "liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). As such, the "rejection of expert testimony is the exception and not the rule." *Dorman Prods. v. PACCAR, Inc.*, 201 F. Supp. 3d 663, 686 (E.D. Pa 2016) (quoting Fed. R. Evid. 702 Advisory Committee Note).

Courts must address a "trilogy of restrictions" before permitting the admission of expert testimony: qualification, reliability and fit. *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). The party offering the expert must establish each requirement by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999).

### A. Qualification

"To qualify as an expert, Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 335 (3d Cir. 2002) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)). The Third Circuit has instructed courts to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert. *See Waldorf*, 142 F.3d at 625. "The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or education' [] qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990) [hereinafter "*Paoli I*"] (quoting Fed. R. Evid. 702).

Moreover, "[t]his liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts." *Pineda*, 520 F.3d at 244. Thus, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996).

## B. Reliability

The reliability requirement "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) [hereinafter "*Paoli II*"] (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590, (1993)). The test of reliability is "flexible" and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 141–42 (emphasis omitted). In determining whether the reliability requirement is met, courts examine the following factors where appropriate:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (citing *Paoli II*, 35 F.3d at 742 n.8). These factors are "neither exhaustive nor applicable in every case." *Kannankeril*, 128 F.3d at 806–07.

Under the reliability prong, parties "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to

demonstrate by a preponderance of evidence that their opinions are reliable." *Paoli II*, 35 F.3d at 744 (emphasis omitted). "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Mitchell*, 365 F.3d at 244 (quoting *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

### C. Fit

For expert testimony to meet the "fit" requirement, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal citations omitted). "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

## IV. DISCUSSION

Corizon defendants seek to exclude, under Federal Rule of Evidence 702, the reports and testimony of two of plaintiffs' experts, Dr. Robert L. Cohen and Dr. Sarah E. Wakeman. For the reasons that follow, the Court grants in part and denies in part Corizon defendants' Motions seeking to exclude Dr. Cohen and Dr. Wakeman's reports and testimony.

### A. Motion to Exclude the Testimony of Dr. Robert Cohen, M.D.

Plaintiff describes Cohen as a "correctional health expert." Pl. Consol. Daubert Resp. 2. Cohen's report opines that (1) Wahabu violated Corizon's practices and the relevant standard of care, (2) Wahabu's actions resulted in a lack of observation of Wichterman as he lost

consciousness, and (3) had Wahabu observed the loss of consciousness, Wichterman could have been saved by emergency intervention, such as the administration of Narcan. Pl. Consol. Daubert Resp. 4–5. To be admissible at trial, each opinion offered by Cohen must meet Rule 702's requirements of qualification, reliability, and fit. *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

### i. Qualification

As a preliminary matter, Dr. Cohen is highly qualified. Cohen is medical doctor who is board-certified in the field of internal medicine with more than thirty-five years of experience in correctional medicine. Corizon Def. Mot. To Exclude Cohen Ex. 1. Cohen has served as a federal and state court-appointed monitor for compliance with consent decrees and settlement agreements regarding the provision of medical care in prisons and jails in at least seven different jurisdictions. Pl. Resp. 8. He has served as a member of the National Commission on Correctional Health Care and as an appointed member of the New York City Board of Correction. Pl. Resp. 8; Corizon Def. Mot. To Exclude Cohen Ex. 1. Cohen also worked on cases involving evaluation of conditions in the PDU, the same unit involved in this matter. Pl. Resp. 8. Furthermore, as Director of the Montefiore Center for Rikers Island Health Services, Cohen supervised the provision of medical services for more than 13,000 prisoners in New York City jails and oversaw a staff of approximately 500 physicians, mid-level practitioners, registered nurses, licensed practical nurses, psychiatrists, psychologists, social workers, pharmacists, laboratory technicians, and administrative and clerical staff. Corizon Def. Mot. To Exclude Cohen Ex. 1.

Based on this experience, Cohen has "specialized knowledge" regarding correctional medicine. *See Betterbox Commc'ns Ltd.*, 300 F.3d at 335. Therefore, he is qualified to offer an

opinion regarding the standard of care that should be provided to a detainee at the PDU, the impact of Wahabu's acts or omissions, and the cause of harm to Wichterman.

### ii. Reliability

First, Corizon defendants argue that Cohen fails to reliably establish the standard of care that Wichterman was entitled to as a detainee. Corizon Def. Mot. Exclude Cohen 7. In support of this argument they state that Cohen "fails to address the relevant national standards, either the National Commission of Correctional Health Care and the American Correctional Association standards." *Id*. They contend that Cohen's assertions that Wahabu acted inappropriately are no more than *ipse dixit*. *Id.* at 8. The Court disagrees.

Although Cohen does not use the phrase "standard of care" he states that Wahabu's conduct "amounted to a seriously improper nursing action." Corizon Def. Mot. To Exclude Cohen Ex. 1, at 12. Pennsylvania does not require that an expert use "magic words" when testifying to the applicable standard of care in a medical malpractice case. *Laskowski v. U.S. Dept. of Veterans Affairs*, 918 F. Supp. 2d 301, 314 (2013). "Pennsylvania courts have consistently explained that 'the standard of care in medical malpractice actions is first and foremost what is reasonable under the circumstances.'" *Id.* (citing *Joyce v. Boulevard Physical Therapy & Rehab. Ctr., P.C.*, 694 A.2d 648, 656 (Pa. Super. Ct. 1997)); *see also Fox v. Horn*, No. 98-5279, 2000 WL 49374, at *6 (E.D. Pa. Jan. 21, 2000) ("An expert need not use 'magic words' . . . when expressing her opinion to make a prima facie case. Instead the Court must look at the substance of the expert's testimony."). Throughout his report, Cohen references Corizon's policies, practices, and expectations of Corizon supervisors. In context, Cohen's testimony regarding "improper nursing action[s]" is best interpreted as a reference to the standard of care.

Having concluded that Cohen's testimony constitutes standard of care testimony, the Court turns to whether the testimony is reliable.

In support of his conclusion that Wahabu's conduct was "seriously improper" or fell below the standard of care, Cohen discusses Corizon policies and references his professional judgment based on his experience working in correctional medicine. Cohen reviewed extensive case materials in developing his opinions, including: eighteen depositions, deposition exhibits, surveillance video, and documents obtained from Corizon. Corizon Def. Mot. To Exclude Cohen Ex. 1, at 3. Therefore, the Court concludes that Cohen's opinion as to the standard of care required of a registered nurse in the correctional setting is based on good grounds and meets Rule 702's reliability requirement. *See Laskowski,* 918 F. Supp. 2d at 314 ("Although the standard of care must be objective, an expert who relies on his or her years of practice and experience in a particular field can sufficiently establish the standard of care."); *Morgan-Mapp v. George W. Hill Corr. Facility*, No. 07-2949, 2008 WL 11366456, at *1 (E.D. Pa. Oct. 3, 2008) (finding correctional medicine expert's opinion to be reliable based on expert's application of "wealth of experience . . . to the specific facts of this case" and expert's review of medical records, policies and procedures, and deposition transcripts).

Next, Corizon defendants argue that Cohen's report fails to "provide how any action or inaction by Corizon defendants caused Wichterman harm." Corizon Def. Mot. Exclude Cohen 10. The Court disagrees. Cohen's report provides reliable expert opinions regarding causation. First, as set forth above, he opined on standard of care. He then concluded that Wahabu's failure to meet the standard of care caused Wichterman's harm. Specifically, Cohen stated that had Wahabu "identified the fact that Mr. Wichterman used heroin . . . . Mr. Wichterman would have been observed closely and treated with Narcan when he lost consciousness." Corizon Def. Mot.

To Exclude Cohen Ex. 1, at 12. Furthermore, Cohen states "Had [Wahabu] performed his rounds appropriately, he would have noted that Mr. Wichterman was unconscious, and required emergency treatment." *Id.* "Narcan was available in the PDU and Nurse Wahabu knew how to use it. Narcan reverses heroin overdoses and its administration would have saved Mr. Wichterman's life." *Id.* Cohen's conclusions as to causation are based on his experience as a medical doctor working in correctional medicine and on his review of the record, as described above, including the inspection of eighteen depositions, video footage, and exhibits. Cohen's expertise, applied to the facts of this case, renders his causation opinion reliable under Rule 702.

### iii. Fit

Finally, the Court must evaluate whether Cohen's testimony meets Rule 702's "fit" requirement by assisting "the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Fit "goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591.

Cohen's opinion regarding the standard of care in a medical facility such as the PDU will help the jury assess whether Corizon defendants failed to meet that standard and whether that failure caused Daniel Wichterman's death. "The Pennsylvania Supreme Court has stated that a finding of malpractice must be supported by expert testimony suggesting the defendant deviated from the standard of care and that the deviation was a substantial factor leading to plaintiff's harm." *Fox v. Horn*, No. 98-5279, 2000 WL 49374, at *6 (E.D. Pa. Jan. 21, 2000). Cohen's standard of care and causation testimony is highly relevant to plaintiff's medical malpractice claim. For those reasons, Cohen's testimony as to both standard of care and causation fit the facts of the case.

As a final matter, Corizon defendants object to Cohen's use of the phrase "blatantly indifferent" in describing Wahabu's conduct. They argue that although Cohen uses the term "blatantly" instead of "deliberately," Cohen is opining on the ultimate legal conclusion of deliberate indifference. They further state that any such testimony on the ultimate legal issue of deliberate indifference does not assist the jury in understanding the evidence or determining a fact in issue, instead it merely "tells a jury what result to reach, expresses a legal conclusion and includes assertions regarding a defendant's state of mind." *See* Corizon Def. Mot. Exclude Cohen 12 (citing *Wilson v. Douglas County*, No. 03-70, 2005 WL 3019486 at *2 (D. Neb. Nov. 10, 2005)).

The Court agrees with Corizon on this issue. Although Cohen does not specifically use the phrase "deliberate indifference," his conclusion that a defendant acted with "blatant[] indifferen[ce]" does not assist the jury in understanding the evidence or determining a fact in issue, as required under Rule 702, and presents a danger of misleading the jury. Under Rule 403, courts may exclude evidence if its probative value is substantially outweighed by the danger of "confusing the issues" or "misleading the jury." Fed. R. Evid. 403. In this case, the Court concludes that the probative value, if any, of Cohen's testimony that a defendant was "blatantly indifferent" is substantially outweighed by the danger of misleading the jury and, therefore, must be excluded. *See Quagliarello v. Dewees*, 802 F. Supp. 2d 620, 624 (E.D. Pa. 2011) ("Collectively [Federal Rules of Evidence 701, 702, 704, and 403] afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, and require the court to exclude opinions phrased in terms of inadequately explored legal criteria.") (internal citations omitted).

For the foregoing reasons Corizon defendants' Motion to Exclude the Expert Testimony of Robert L. Cohen, M.D. is granted in part and denied in part. The Court grants that part of defendants' Motion seeking to exclude testimony concluding that defendants' actions were "blatantly indifferent." The Court denies that part of defendants' Motion seeking to prohibit Cohen from testifying to (1) standard of care and (2) causation.

### B. Motion to Exclude the Testimony of Dr. Sarah Wakeman, M.D.

Plaintiff describes Dr. Wakeman as an "addiction medicine expert." Pl. Consol. Daubert Resp. 2. Wakeman's report opines that (1) Wahabu's actions violated Corizon's written policies, (2) the forensic evidence demonstrates that Wichterman's overdose was the result of his pre-arrest ingestion of both opiates and benzodiazepines, and (3) if Wichterman had survived the overdose and been offered medical treatment, his prognosis for recovery from opioid use disorder would have been favorable. *Id.* at 5–6.

Corizon defendants argue that Wakeman's testimony is inadmissible because her opinions are "conclusory" and she "fail[s] to articulate applicable standards of care." Def. Mot. Exclude Wakeman 7. They further contend that establishing the standard of care through expert testimony is a critical step in establishing a *prima facie* case of medical malpractice and Wakeman's failure to articulate a standard of care renders her testimony inadmissible. *Id.* (citing *Brannan v. Lankenau Hospital*, 417 A.2d 196, 199 (Pa. 1980)).

Corizon defendants mischaracterize the admissibility standard. Wakeman's testimony will not be discarded in its entirety on the ground that she fails to provide admissible standard of care testimony. Although, "*a* testifying expert physician" is typically required to establish the standard of care in a medical negligence action, *see Estate of Goldberg v. Nimoityn*, 193 F. Supp.

3d 482, 489 (E.D. Pa. 2016), the Court is not aware of any requirement that *each expert* in a medical negligence action offer admissible standard of care testimony.

Because Cohen's testimony regarding standard of care has been ruled admissible, *see supra* Section IV(A), any failure by Wakeman to present an admissible opinion as to standard of care would not impact the relevance of the remainder of her expert opinions. However, each opinion offered by Wakeman must meet the admissibility requirements of Rule 702 which requires courts to address a "trilogy of restrictions" before permitting the admission of expert testimony: qualification, reliability and fit. *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

### i. Qualification

"To qualify as an expert, Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Betterbox Commc'ns Ltd.*, 300 F.3d at 335 (quoting *Waldorf*, 142 F.3d at 625).

Wakeman has been practicing medicine for more than nine years and has been on the faculty of Harvard Medical School since 2012. Pl. Consol. Daubert Resp. 11. She also has specific expertise in addiction medicine, and has served as a faculty member of the Center for Prisoner Health and Human Rights at Brown University, as the Course Director for the Opioid Use Disorder Education Program at Harvard Medical School, and as Medical Director of the Massachusetts General Hospital Addiction Consult Team. *Id.*; Corizon Def. Mot. to Exclude Wakeman Ex. 1. Additionally, Wakeman serves as chair of both the American Society of Addiction Medicine Drug Court Task Force and the Massachusetts Society of Addiction Medicine Policy Committee, and was appointed to the Governor of Massachusetts's Opioid Addiction Working Group. *See* Corizon Def. Mot. to Exclude Wakeman Ex. 1 & 2. Wakeman

has also published several articles on the treatment of substance abuse disorders in correctional settings.  Pl. Consol. Daubert Resp. 11.

This extensive experience in the field of addiction medicine qualifies Wakeman to use testimony and forensic toxicology evidence to opine about the clinical cause of Wichterman's death.  She is also qualified to testify as to whether medical intervention could have saved Wichterman's life, and Wichterman's likelihood of recovery had his life been saved.  However, Wakeman has never worked in a correctional setting, and is not qualified to testify to "standard of care."

ii.  *Reliability*

The reliability requirement demands that experts have "good grounds" for their beliefs and that scientific knowledge be based on the methods and procedures of science rather than on subjective belief or unsupported speculation.  *Paoli II*, 35 F.3d at 742.

In preparing her report, Wakeman reviewed (1) the Complaint, (2) all deposition exhibits including toxicology testing results both premortem and postmortem, autopsy report, and mental health records from Rockford Partial hospitalization Program, (3) the depositions of David Wichterman, Jr. and Donna Werner, and (4) the report and supplemental report of Dr. Jonathan Arden.  Corizon defendants contend that this record review neglects some of the most important evidence in the case including video footage of Wichterman's intake and medical screening.  Pl. Consol. Daubert Resp. 8.

Although Wakeman's review of the record is incomplete, her failure to conduct an exhaustive review goes to the weight of the evidence, not its admissibility.  "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—

rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Mitchell*, 365 F.3d at 244 (quoting *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

Wakeman appropriately relied on, *inter alia*, the toxicology test results, autopsy report, mental health records, reports of plaintiff's forensic pathology expert, and her own expertise in addiction medicine to develop her opinion that Wichterman's overdose was the result of his pre-arrest ingestion of both opiates and benzodiazepines. Wakeman's opinion is based on good grounds. To the extent that Corizon defendants seek to challenge Wakeman's opinion, they can do so through cross-examination at trial.

Wakeman also opines that Wichterman's prognosis for long-term remission and recovery from opioid use disorder would have been favorable if he had survived the overdose. Expert testimony on the issue of prognosis is regularly held to be reliable when it is offered by a treating physician who directly evaluates the individual in question and utilizes standard diagnostic techniques. *See Lee v. Kmart Corp.*, No. 2014-0079, 2017 WL 3083412, at *6 (D.V.I. July 18, 2017). In this case, Wakeman never acted as Wichterman's treating physician and was unable to evaluate him directly because of his death. Consequently, Wakeman based her opinion on: (1) Wichterman's medical treatment records showing that he sought treatment in 2012 for bipolar disorder and had no history of drug use at that time, (2) the deposition testimony of Wichterman's family members, (3) the reported means of heroin use (insufflation of heroin as opposed to intravenous injection), and (4) her knowledge of heroin treatment and the likelihood of long term remission for individuals with opioid use disorder. Corizon Def. Mot. to Exclude Wakeman Ex. 1.

Although Wakeman does not cite any statistics or peer reviewed articles supporting her conclusions, as a qualified medical expert Wakeman is entitled to rely on her own expertise as applied to the facts of this case. *See Keller v. Feasterville Family Heath Care Ctr.*, 557 F. Supp. 2d 671, 681 (E.D. Pa. 2008) (finding the expert testimony did not lack foundation where the expert had a medical background and reviewed medical records). The Court concludes Wakeman's opinion on prognosis is based on good grounds and meets the Rule 702 requirement of reliability.

### iii. Fit

The third step in Rule 702's admissibility analysis requires the Court to evaluate whether Wakeman's expert opinions meet the requirement of "fit" by "assist[ing] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

Wakeman's opinion as to the cause of Wichterman's overdose and subsequent death helps the trier of fact understand the relevance of Wichterman's ingestion of klonopin and refutes defendants' theory that Wichterman may have ingested additional drugs after he was taken into custody. Corizon Def. Mot. Exclude Cohen 4. According to Wakeman, the co-ingestion of klonopin, a benzodiazepine, with heroin, an opiate, "markedly increases the risk of overdose and death" because both drugs "slow down breathing and when taken in combination, . . . produce prolonged respiratory depression, greater than either drug alone." Corizon Def. Mot. to Exclude Wakeman Ex. 1 at 2. Wakeman further testifies that Wichterman's toxicology report is consistent with this theory and "does not necessarily indicate any additional use of a substance between the time of arrest and death." *Id.* This evidence is relevant to the determination of at least one material fact, namely, whether Wichterman's heightened risk of overdose should have been identified by Wahabu during his medical intake screening.

Similarly, Wakeman's expert opinion regarding Wichterman's prognosis for long-term remission is relevant to the issue of damages. Pl. Consol. Daubert Resp. 7. Specifically, Wakeman's testimony regarding Wichterman's ability to recover from opioid addiction disorder would assist a jury in calculating Wichterman's lost earnings.

Finally, Wakeman opines that Wahabu's actions violated Corizon's written policies. To the extent that plaintiff intends to use such testimony to establish the relevant standard of care, as discussed above, Wakeman is not qualified to do so based on her lack of experience working in correctional settings. Moreover, because Wakeman cannot testify to the standard of care, she is prohibited from testifying that Wahabu's actions violated Corizon's policies because any such testimony does not meet the "fit" requirement. A jury is independently capable of understanding Corizon's policies and assessing whether Wahabu violated those policies. Consequently, expert testimony on Corizon's policies would not "assist the trier of fact" and is inadmissible under Rule 702.

For the foregoing reasons Corizon defendants' Motion to Exclude the Expert Testimony of Sarah E. Wakeman, M.D. is granted in part and denied in part. Wakeman may testify regarding (1) her opinion that Wichterman's overdose was the result of his pre-arrest ingestion of both opiates and benzodiazepines, and (2) her opinion that Wichterman had a favorable prognosis. Wakeman cannot testify about standard of care because she is not qualified to do so and she cannot testify to defendants' alleged violations of Corizon policy because such testimony does not "assist the trier of fact."

**V.       CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part both of Corizon defendants' Motions, as follows:

(1)     In ruling on Corizon defendants' Motion seeking to exclude Dr. Robert Cohen's report and testimony:

- The Court denies those parts of the Motion seeking to prohibit Dr. Cohen from testifying to standard of care and causation, and

- The Court grants that part of the Motion seeking to exclude testimony that defendants' actions were "blatantly indifferent."

(2)     In ruling on Corizon defendants' Motion seeking to exclude Dr. Sarah Wakeman's report and testimony:

- The Court denies those parts of the Motion seeking to prohibit Dr. Wakeman from testifying to the cause of Mr. Wichterman's death and his prognosis for long term recovery from opioid use disorder, and

- The Court grants those parts of the Motion seeking to exclude Dr. Wakeman from testifying to standard of care and her opinion that Wahabu violated Corizon policies.

An appropriate Order follows.