## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DAVID WICHTERMAN, JR., as Administrator of the Estate of Daniel Wichterman,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | **NO.  16-5796** |
| **CITY OF PHILADELPHIA, CORIZON HEALTH, and TAIRU WAHABU, RN,** | |
| **Defendants.** | |

**DuBois, J.**                                                          **December 21, 2020**

## M E M O R A N D U M

### I.      INTRODUCTION

On January 30, 2015, Daniel Wichterman died while in custody of the Philadelphia Police Department.  Wichterman allegedly suffered an opioid overdose in a holding cell at the City of Philadelphia Police Detention Unit ("PDU") after being arrested on suspicion of driving under the influence of narcotics.  Plaintiff David Wichterman, Jr., the Administrator of the Estate of Daniel Wichterman and his brother, brought this action, asserting a claim under 28 U.S.C. § 1983 against the City of Philadelphia (the "City") and state law negligence claims against Corizon Health and Tairu Wahabu, RN.  Presently before the Court is Defendant City of Philadelphia's Fifth Motion in Limine to Preclude Opinions and Conclusions of R. Paul McCauley (Document No. 79, filed Jan. 31, 2020).  For the reasons that follow, the Motion is granted in part and denied in part.

## II.   BACKGROUND[1]

### A.  Arrest and Detention in the PDU

On January 30, 2015, Daniel Wichterman was arrested on suspicion of driving under the influence ("DUI") after he was involved in a minor automobile accident.  City Def. Stmt. of Undisputed Material Fact ("City SUMF") ¶¶ 7, 20.  At approximately 3:00 p.m. on that date, two police officers, Officer Gregory Sulock and Officer Richard Greger responded to the accident. *Id*. at ¶ 8.  Wichterman informed both Sulock and Greger that he had taken heroin.  *Id.* at ¶¶ 12, 17.  Both officers observed that Wichterman appeared intoxicated but testified that they did not believe he was in a state of overdose.  *Id.* at ¶¶ 13, 14, 15, 21, 23.  After Officer Greger determined that there was probable cause for a DUI charge, Wichterman was transported to the PDU.  *Id.* at ¶¶ 20, 24.

Wichterman arrived at the PDU at approximately 5:33 p.m., on January 30, 2015, at which point he was searched and escorted to the Accident Investigation Division ("AID").  City SUMF ¶¶ 28, 39.  The AID Officer on duty, Officer Patrick Farrell, interviewed Wichterman from approximately 5:40 p.m. to 6:12 p.m.  *Id.* at ¶ 40; Pl.'s Statement of Facts ("Pl. SOF") ¶ 67.  Farrell observed that Wichterman had constricted pupils, slow speech and movements, and a raspy voice.  City SUMF ¶ 41.  After conducting the interview, Farrell walked Wichterman to the nurse's station for a medical screening and a blood draw to test for narcotics by defendant Nurse Tairu Wahabu.  *Id.* at ¶ 46.

After the medical screening, Wichterman was taken to the cell block, arriving at approximately 6:17 p.m.  Pl. SOF ¶ 121; City SUMF ¶ 62.  The two Police Correctional Officers ("PCOs") assigned to the cell block at the time were Justin Avery and William Gwalthney.  City

---

[1] The background of this case is summarized in detail in the Court's Memorandum dated July 17, 2019 (Document No. 55).  It will be recited here only as necessary to address the pending Motion.

SUMF ¶ 64.  Both Avery and Gwalthney testified that they had no concerns about Wichterman's health or safety at the time he arrived on the cell block.  *Id.* at ¶¶ 71, 73.  Wichterman was placed in cell #2 with another detainee, Michael Panichelli.  *Id.* at ¶ 74.  From 6:17 to 10:15 p.m. Wichterman remained in his cell.  During those four hours Avery and Gwalthney walked up and down the corridor a number of times, but neither physically entered Wichterman's cell until after 10:00 p.m.  *Id.* at ¶¶ 76, 79.

PCO Lavern Joyner was also on duty at the time, working as a fingerprint technician.  *Id.* at ¶ 65.  Joyner went to Wichterman's cell to obtain his fingerprints on two occasions, at 8:26 p.m. and at 8:56 p.m., and he appeared to be asleep.  *Id.* at ¶¶ 80, 83.  In attempting to awaken Wichterman, Joyner testified that she opened the door to his cell, called his name once or twice, received no response, shut the door, and left the cell block.  *Id.* at ¶ 81.  She further testified that she believed that Wichterman was sleeping and did not have any concerns about Wichterman's health or safety.  *Id.* at ¶ 82.  In contemporaneous notes Joyner wrote that Wichterman was "knocked out," "would not move," and that he was "sleeping hard."  Joyner Dep. 40:13–41:3, 45:5–20.

At approximately 10:15 p.m., Wichterman's cellmate, Panichelli informed Gwalthney that something might be wrong with Wichterman.  City SUMF ¶ 91.  Avery and Gwalthney entered Wichterman's cell, attempted unsuccessfully to wake him, and then called defendant Nurse Tairu Wahabu for help.  *Id.* at ¶¶ 93, 94.  At 10:18 p.m. Wahabu arrived at Wichterman's cell, began CPR, and instructed the PCOs to call 911.  *Id.* at ¶ 94–95.

Wichterman was pronounced dead at 11:31 p.m.  *Id.* at ¶ 97.  His Autopsy and Toxicology Report stated that the cause of death was drug intoxication as a result of an opioid overdose.  *Id.* at ¶ 98; Corizon Stmt. of Undisputed Material Facts ("Corizon SUMF") ¶ 25.  The

parties dispute whether Wichterman consumed the fatal dose of heroin before or after arrival at the PDU.  Corizon SUMF ¶ 26.

### B.  PDU Procedure and Training

The PDU admits on average over 100 detainees per day.  City SUMF ¶ 99.  All Philadelphia DUI arrestees are sent to the PDU.  Pl. SOF ¶ 13.  Many of these individuals arrive at the PDU under the influence of drugs or alcohol.  City SUMF ¶ 101.  Approximately half of the arrivals at the PDU are addicted to opiates.  Wahabu Dep. 158:3–13; Pl. SOF ¶ 7.  To avoid difficult confrontations with intoxicated detainees, the PDU staff regularly employ an unofficial practice of allowing detainees to "sleep off" their intoxication before attempting to process them. City SUMF ¶ 104.

Despite the PDU's regular admission of individuals struggling with opiate use disorder, the PDU does not provide its employees with regular training on how to recognize and address the signs and symptoms of opiate addiction, intoxication, or overdose.  *Id.* ¶¶ 49, 50.  Avery, Gwalthney, and Joyner all testified that they never received training on recognizing the signs of opiate intoxication or overdose.  *Id.*

### C.  Procedural History

On November 10, 2017, plaintiff, as Administrator of Wichterman's Estate, filed an Amended Complaint (Document No. 29) alleging, *inter alia*, a claim under 28 U.S.C. § 1983 against the City of Philadelphia for deliberate indifference in failing to train officers to recognize and respond to signs of opiate overdoses.[2]

On March 16, 2018, plaintiff timely provided defendants with the expert report of R. Paul McCauley, an expert witness in police practices ("McCauley Report").  Def.'s Mot. at 6; Pl.'s

---

[2] The Court denied defendant City of Philadelphia's Motion for Summary Judgment on this claim on July 16, 2019.

Resp. at 2.   In preparing the forty-page Report, McCauley reviewed the Amended Complaint,

deposition transcripts, deposition exhibits, documents produced through discovery, and

surveillance video of the incident.  *Id.* at 3-4.   The McCauley Report outlines sixteen expert

opinions and McCauley's analysis supporting them.  Def.'s Ex. A at 38-40 ("McCauley

Report").  Those opinions at issue in this Motion are:

3. Directives 82 and 128 are complex and interrelated directives requiring considerable training and supervision so officers understand their content and the officers' performance expectations. Not providing reasonable training and supervision is contrary to accepted police practices.

4. The involved officers failed to comply with cell checks, and maintenance of related records, as required by Directives 82 and 128, which is contrary to accepted police practices.

5. Reasonably trained and competent PDU officers and supervisors would know the official charge of DUI is not the only criterion for monitoring Wichterman's long-term well-being while in custody in the PDU.  The charge and/or the actual presence of alcohol (ex. odor) can mask other medical conditions such as drug overdose and other potentially fatal medical conditions.  Detainees must be responsive to PCO/PO and nurse's cell checks, regardless of whether the cause is believed to be deep sleep, semi-consciousness, or unconsciousness.  The failure of PDU officers to require Wichterman to respond to well-being cell checks was contrary to accepted police detention best practices.

6. Reasonably directed and trained officers and supervisors would have detected that Wichterman, a DUI prisoner who had used heroin, and could not be awoken while in custody, was in a medical emergency that was causing a delay of his processing. Reasonably directed and trained officers would have reported the condition to the nurse or superiors knowing the arrest "charge" may be masking an overdose.

7. Had the PPD trained PDU officers to the point where they were skilled in performing consistently with Directives 82 and 128, as discussed in this report, PCOs would have notified the nurse and/or supervisor that Wichterman was not waking up between 8:30 p.m. and 9:00 p.m. as reported on the Flow Chart. This failure unnecessarily delayed Wichterman's medical care.

9. The practice of PCOs, at the start of a shift, pre-entering cell rounds in the log every 15 minutes rather than recording the actual time of

the rounds is a false report. This practice is contrary to policy and in effect allows the log entries to be made when no cell rounds/checks are actually conducted. Such conduct created unnecessary medical risks for Wichterman and all detainees and such practices are contrary to accepted police best practices.

15. The long-term practice of the PPD not conducting comprehensive Internal Affairs Investigations of all in-custody deaths results in the failure to address and correct/enhance Directives 82, 128, and the PDU [Standard Operating Procedures], and the attendant training is contrary to accepted police administrative practices.

16. The failure of the PPD Inspection Services to address the evolving and recognized opioid crisis in Philadelphia prior to 2015, in the context of in-custody overdosing/death does not reflect appropriate police management and, in fact, was deliberately indifferent to the obvious and known risk that detainees in PPD custody would suffer harm or death.

McCauley Report at 38-40.

On January 31, 2020, the City filed the pending Motion in Limine to preclude all sixteen of McCauley's opinions and the portions of the Report that support those opinions. Plaintiff filed his Response on March 20, 2020, arguing the Motion was untimely and opposing it as it relates to eight of the opinions, those listed *supra*. The Motion is thus ripe for decision.

## III.   LEGAL STANDARD

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

That rule requires the Court to act as a gatekeeper and is applicable to scientific testimony and testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). A court must determine whether an expert "employs in

the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Rule 702 has "a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). As such, the "rejection of expert testimony is the exception and not the rule." Fed. R. Evid. 702, advisory committee's note. The party offering the expert must establish each requirement by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999).

"Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)). In this case, defendant challenges only the qualification and fit of plaintiffs' expert testimony.

"To qualify as an expert, Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 335 (3d Cir. 2002) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)). The Third Circuit has instructed courts to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert. *See Waldorf*, 142 F.3d at 625. "The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or education' [ ] qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990) (quoting Fed. R. Evid. 702).

For expert testimony to meet the "fit" requirement, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition

goes primarily to relevance.  Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal citations omitted). "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

## IV.    DISCUSSION

The City seeks to exclude the expert report and testimony of plaintiff's police practices expert, R. Paul McCauley under Rule 702.  For the reasons that follow, the Motion is granted in part and denied in part.

### A.  Timeliness

The City filed this Motion in Limine on January 31, 2020.  Although not labeled as such, the City's Motion is a *Daubert* motion because it seeks to exclude plaintiff's expert testimony based on the expert's qualifications and the relevance of the opinions.  The Court, therefore, analyzes the Motion as a *Daubert* motion.

Plaintiff argues the Motion is untimely because, under the Amended Scheduling Order (Document No. 23, filed Sept. 25, 2017), *Daubert* motions were to be filed by May 25, 2018. Plaintiff avers that, by failing to file its *Daubert* Motion before the deadline, the City has waived its arguments in the Motion.  Although the Motion is untimely, the deadline "was set by the Court, and the Court has discretion to change this date as part of its inherent authority to manage trials." *Daddio v. A.I. DuPont Hosp. for Children of Nemours Found.*, 650 F. Supp. 2d 387, 402 (E.D. Pa. 2009).  Plaintiff does not argue he is prejudiced by the City's late filing, and the Court is unaware of any prejudice. Accordingly, the Court will consider the City's *Daubert* Motion.

### B.  Unopposed Portions of the Motion

Plaintiff does not oppose the City's Motion as it relates to Opinions 1, 2, 8, 10, 11, 12, 13, and 14.  Pl.'s Resp. at 5 n. 3.  Thus, the Motion is granted as unopposed to the extent it seeks to prohibit McCauley from testifying as to Opinions 1, 2, 8, 10, 11, 12, 13, and 14 and the related portions of the McCauley Report.

### C.  Fit

The City first argues that Opinions 3, 4, 5, 7, 9, and 15 and the related portions of the McCauley Report are inadmissible because they do not meet *Daubert*'s fit requirement.  The City makes two arguments as to these opinions.

First, the City avers that Opinions 3, 7, and 15 are not relevant to the extent they discuss Philadelphia Police Directives 82 and 128, titled "Adult Detainees in Police Custody" and "Intoxicated Persons in Police Custody," respectively.  The City argues that because neither Directive contains procedures or training regarding opiate overdoses, plaintiff's failure-to-train claim does not implicate the Directives.  The Court disagrees with the City on this issue.

Appendix C to Directive 82 provides, "All non-sworn personnel (Police Correctional Officers) will be trained to recognize potential medical emergencies [and] provide medical assistance."  Directive 82, App'x C, § (II)(L); *see also Wichterman v. City of Philadelphia*, 2019 WL 3216609, at *8 (E.D. Pa. July 17, 2019) ("[U]nder Directive 82 police correctional officers are supposed to receive biannual training on how to recognize medical emergencies and provide basic medical assistance.").  Directive 128 outlines the responsibilities of PCOs when they encounter a semiconscious detainee, including their obligation to transport the detainee to a hospital for evaluation by a physician.  Directive 128 §§ (I), (III)(A); *Wichterman*, 2019 WL 3216609, at *8.  These Directives were implicated when Wichterman was brought to the PDU

while intoxicated and when he became unresponsive.  Therefore, the procedures detailed in the Directives are relevant to plaintiff's claim that the City failed to provide adequate training on "how to recognize and respond to the signs of an opiate overdose."  *Wichterman*, 2019 WL 3216609, at *16.  The Court thus concludes Opinions 3, 7, and 15 and the related portions of the McCauley Report are relevant to the extent they relate to Directives 82 and 128.[3]

Second, the City argues that Opinions 4, 5, and 9 are not relevant to plaintiff's failure to train claim to the extent they discuss the practice of "cell checks."[4]  Specifically, Opinion 4 states, "The involved officers failed to comply with cell checks, and maintenance of related records,"  McCauley Report ¶ 4; Opinion 5 states, "The failure of PDU officers to require Wichterman to respond to well-being cell checks was contrary to accepted police detention best practices,"  McCauley Report ¶ 5; and Opinion 9 discusses the practice of pre-entering cell rounds in the log, as opposed to recording the rounds as they are conducted, which McCauley opines creates a "false report."  McCauley Report ¶ 9.  Plaintiff argues these opinions are relevant because they demonstrate the risk of failing to train PCOs, which, in turn, shows the importance of adequate training.  The Court agrees with plaintiff on this issue.

Plaintiff's failure to train claim is based on the theory that the City failed to properly train PCOs to recognize and respond to opiate overdoses.  McCauley opines that "the essential element of a cell check is for the PCO to know which detainees are at a potential risk of opioid use/death risks."  McCauley Report 20.  According to plaintiff, the City's alleged failure to train PCOs to properly conduct cell checks constitutes a failure to train PCOs to detect signs of opiate

---

[3] The Court notes that this is the City's only objection to the admissibility of Opinions 3 and 15, but the City also argues portions of Opinion 7 are inadmissible as a medical opinion and legal conclusion.  Those arguments are addressed in Sections (IV)(D) and (F), *infra*.

[4] The McCauley Report explains that regular checks of inmates' cells are conducted "to make sure the detainees are in their cells, not injured, not engaged in self-harm, not being assaulted, and that they are breathing."  McCauley Report at 20.

overdoses.  In other words, to adequately train PCOs to recognize an opiate overdose, the City must train them to be in a position to observe the signs of an overdose.  The Court concludes Opinions 4, 5, and 9 and the related portions of the McCauley Report are relevant to the extent they relate to the practice of conducting cell checks.[5]

### D.  Medical Testimony

The City next argues that Opinions 5, 6, 7, and 9 include medical testimony that McCauley is not qualified to provide.  As a preliminary matter, plaintiff presented McCauley as a qualified police practices expert, and the City does not argue otherwise.  McCauley is a professor emeritus of criminology at Indiana University of Pennsylvania.  McCauley Report at 1.  He has taught and conducted criminology research at all academic levels; has served as a Pennsylvania municipal police officer; is a state certified policy instructor; and has written and published over eighty professional papers, books, chapters, and technical reports.  *Id.* at 1-2.  Based on this experience, McCauley has "specialized knowledge" regarding police practices.  *Betterbox Commc'ns Ltd.*, 300 F.3d at 335.  Therefore, he is qualified to offer opinions regarding police policies and procedures.  *See Devine v. Middletown Township*, No. 14-cv-1072, 2016 WL 1728372, at *3 (E.D. Pa. Apr. 29, 2016) ("Dr. McCauley is qualified to opine about police policies and procedures.").  On the other hand, there is no evidence that he has any medical qualifications or experience.  For that reason, the City argues that McCauley is not qualified to testify as to Opinions 5, 6, 7, and 9, which the City argues require medical expertise.  The Court considers each opinion in turn.

---

[5] The Court notes that this is the City's only objection to the admissibility of Opinion 4, but the City also argues portions of Opinions 5 and 9 are inadmissible as medical and credibility opinions that McCauley is not qualified to provide.  The Court addresses those arguments in Section (IV)(D) and (E), *infra*.

Opinion 5 states, in relevant part, "Reasonably trained and competent PDU officers and supervisors would know the official charge of DUI is not the only criterion for monitoring Wichterman's long-term well-being while in custody in the PDU. The charge and/or the actual presence of alcohol (ex. odor) can mask other medical conditions such as drug overdose and other potentially fatal medical conditions." McCauley Report ¶ 5. The City argues the second sentence of this Opinion is medical testimony. The Court disagrees with the City on this issue. Read in conjunction with the first sentence, Opinion 5 states that "[r]easonably trained and competent PDU officers and supervisors" would know that "the charge and/or the actual presence of alcohol (ex. odor) can mask other medical conditions such as drug overdose." McCauley Report ¶ 5. As a police practices expert, McCauley is qualified to testify on the question whether a training program is adequate. *See Schieber v. City of Philadelphia*, No. 98-cv-5648, 2000 WL 1843249, at *8 (E.D. Pa. Dec. 13, 2000) (permitting police practices expert to testify that "the City failed adequately to train its officers"). McCauley is also qualified to testify as to what a properly trained PCO would know. *See Roberson v. City of Philadelphia*, No. 99-cv-3574, 2001 WL 210294, at *6 (E.D. Pa. Mar. 1, 2001) (police practices expert was permitted to testify that officers "should have been aware of" a specific practice). Accordingly, the Court concludes the challenged portion of Opinion 5 does not include medical testimony and is, therefore, admissible.

Opinion 6 states that Wichterman was experiencing "a medical emergency." McCauley Report ¶ 6. Plaintiff argues this is not medical testimony because "there is hardly any dispute that Mr. Wichterman was experiencing a medical emergency." Pl.'s Resp. at 8; *see also* Strollo Dep. at 117-118. The Court agrees with plaintiff on this issue. Expert testimony is "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. McCauley's statement that

Wichterman experienced a "medical emergency" at the time he was overdosing does not require "scientific, technical, or other specialized knowledge." *Id.* Rather, it is a statement of the obvious circumstances that resulted in Wichterman's death. As such, McCauley's use of the term "medical emergency" is not medical testimony and is, therefore, admissible. [6]

Opinion 7 states that the PDU officers' failure to notify the nurse and/or supervisor that Wichterman was not waking up "unnecessarily delayed Wichterman's medical care." McCauley Report ¶ 7. Similarly, Opinion 9 states that the practice of pre-entering cell rounds rather than recording rounds as they were conducted "created unnecessary medical risks for Wichterman." McCauley Report ¶ 9. The City argues these opinions state medical conclusions that McCauley is not qualified to make. The Court disagrees with the City on this issue. These two opinions do not opine on medical aspects of Wichterman's care or condition that require "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. Rather, the opinions focus on proper police procedures and the consequences of failing to follow them. As a police practices expert, McCauley is qualified to testify on these topics. Therefore, these portions of Opinion 7 and 9 and the related portions of the McCauley Report are admissible.

### E. Credibility Determination

The City next argues that Opinion 9 includes a credibility determination, "which is an improper subject for expert opinion." Def.'s Mot. at 13. Specifically, Opinion 9 states, "The practice of PCOs, at the start of a shift, pre-entering cell rounds in the log every 15 minutes rather than recording the actual time of the rounds is a false report." McCauley Report ¶ 9. The Court concludes this portion of the opinion is inadmissible because it would not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. In view of

---

[6] The Court notes that the City also argues portions of Opinion 6 are inadmissible as legal conclusions. The Court addresses that argument in Section (IV)(F), *infra.*

this ruling, the Court does not address the City's argument that Opinion 9 includes a credibility determination.

To the extent this opinion states that the practice of pre-entering cell rounds, as opposed to recording the time of the actual rounds, constitutes a false report, the trier of fact can determine whether such a report is false.  To the extent that McCauley opines the PCOs involved in this case engaged in the practice of pre-entering cell rounds on the night of Wichterman's death, the trier of fact can review the evidence.  Any evidence of false log entries purportedly showing that inspections were pre-entered every fifteen minutes as opposed to being recorded at the times they were conducted speaks for itself.  McCauley's expertise in police practices does not provide him with "scientific, technical, or other specialized knowledge" that would "assist the trier of fact to understand the evidence."  Fed. R. Evid. 702.  Accordingly, the Court concludes this portion of Opinion 9 and the related portions of the McCauley Report do not meet *Daubert*'s fit requirement and are inadmissible.

### F.  Legal Conclusions

"As a general rule, an expert's testimony on issues of law is inadmissible."  *Whitmill v. City of Philadelphia*, 29 F. Supp. 2d 241, 246 (E.D. Pa 1998).  The legal issues in this case are: (1) whether the City acted with deliberate indifference in failing to provide PCOs with training on opiate overdose recognition and treatment; and (2) whether that lack of training caused Wichterman's death.  The City argues that Opinions 6, 7, and 16 are inadmissible as legal conclusions that "[i]nvade the [p]rovince of the [j]ury" because they "inappropriately conclude that the City and/or certain employees violated a legal duty . . . and that such violations *caused* Wichterman's death."  Def.'s Mot. at 13.  The Court considers whether each opinion states a legal conclusion.

Opinion 6 states that "reasonably directed and trained officers" would have recognized Wichterman was experiencing a medical emergency and would have reported his condition. McCauley Report ¶ 6. McCauley's opinion on the standard of care for "reasonably directed and trained" officers does not answer the ultimate questions whether the City was deliberately indifferent or whether that deliberate indifference caused Wichterman's death. As a police practices expert, McCauley is qualified to testify whether the officers were "adequately directed and trained." *Schieber*, 2000 WL 1843249, at *8. The Court concludes "adequate" and "reasonable" have the same meaning in this context. Thus, this portion of Opinion 6 and the related opinions in the McCauley Report are admissible.

Opinion 7 outlines the procedures PDU officers should have followed "had the PPD trained [them] to the point where they were skilled in performing consistently with Directives 82 and 128." McCauley Report ¶ 7. This statement does not provide an opinion as to the ultimate legal issues in the case. As a police practices expert, McCauley is permitted to testify as to what procedures are outlined in the Directives and whether the PCOs were adequately trained on those Directives. *Roberson*, 2001 WL 210294, at *5. Accordingly, the Court concludes this portion of Opinion 7 and the related opinions in the McCauley Report are admissible.

Opinion 16 states that the City's actions do "not reflect appropriate police management and, in fact, [were] deliberately indifferent to the obvious and known risk that detainees in PPD custody would suffer harm or death." McCauley Report at 41. The Court considers the phrases "appropriate police management" and "deliberately indifferent" separately.

McCauley's opinion that the City's actions do "not reflect appropriate police management" does not answer the ultimate legal questions whether the City was deliberately indifferent or whether that deliberate indifference caused Wichterman's death. Therefore, this is

not a legal conclusion.  However, McCauley's use of the term "appropriate police management" is ambiguous, and whether the City's actions were "appropriate" is not at issue in plaintiff's failure to train claim.  As such, this portion of Opinion 16 would not "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Accordingly, the Court concludes this portion of Opinion 16 and the related portions of the McCauley Report do not meet *Daubert*'s fit requirement and are inadmissible.  *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").  The Court notes that McCauley may testify whether the City's actions were consistent with "accepted police practices."

The Court agrees with the City that McCauley's use of the phrase "deliberately indifferent" is inadmissible as a legal conclusion.  Opinion 16 states McCauley's view as to the first ultimate issue in this case—whether the City was deliberately indifferent in failing to provide PCOs with training on recognizing and responding to opiate overdoses—"answer[ing] the very question tasked the jury, and the Court will not permit an expert to invade the province of the jury."  *Damiani v. Momme*, No. 11-cv-2534, 2012 WL 1657920, at *2 (E.D. Pa. May 11, 2012); *see also Roberson v. City of Philadelphia*, No. 99-cv-3574, 2001 WL 210294, at *5 n.10 (E.D. Pa. Mar. 1, 2001) (plaintiff's police practices expert's opinion that defendant was "deliberately indifferent" was inadmissible as a legal conclusion).  The Court thus concludes McCauley's opinion that the City's actions exhibited deliberate indifference is inadmissible.

## V.    CONCLUSION

For the foregoing reasons, the City's Fifth Motion in Limine is granted in part and denied in part.  That part of the Motion seeking to prohibit R. Paul McCauley from testifying as to

Opinions 1, 2, 8, 10, 11, 12, 13, and 14 is granted as unopposed. The Motion is also granted to

the extent it seeks to prevent McCauley from testifying as to:

- That portion of Opinion 9 and the related portions of the McCauley Report that state, "The practice of PCOs, at the start of a shift, pre-entering cell rounds in the log every 15 minutes rather than recording the actual time of the rounds is a false report";
- Those portions of Opinion 16 and the related portions of the McCauley Report that use the terms "appropriate police management" and "deliberate indifference."

The Motion is denied to the extent to seeks to prevent McCauley from testifying as to:

- Those portions of Opinion 3, 7, and 15 and the related portions of the McCauley Report that discuss Directives 82 and 128;
- Those portions of Opinions 4, 5, and 8 and the related portions of the McCauley Report that discuss cell checks;
- That portions of Opinions 5 and the related portions of the McCauley Report that state "[t]he charge and/or the actual presence of alcohol (ex. odor) can mask other medical conditions such as drug overdose and other potentially fatal medical conditions";
- That portion of Opinion 6 and the related portions of the McCauley Report that state Wichterman was experiencing a "medical emergency";
- That portion of Opinion 7 and the related portions of the McCauley Report that state the PDU officers' failure to notify the nurse and/or supervisor that Wichterman was not waking up "unnecessarily delayed Wichterman's medical care";
- That portion of Opinion 9 and the related portions of the McCauley Report that state the practice of pre-entering cell rounds rather than recording rounds as they are conducted "created unnecessary medical risks for Wichterman";
- That portion of Opinion 6 and the related portions of the McCauley Report that use the term "reasonably directed and trained officers"; and
- That portion of Opinion 7 and the related portions of the McCauley Report that outline the procedures PDU officers should have followed "had the PPD trained [them] to the point where they were skilled in performing consistently with Directives 82 and 128."

All rulings are subject to the right of the aggrieved party to object to specific questions at

trial or to seek reconsideration if warranted by the trial evidence and the law as set forth in this

Memorandum.  An appropriate order follows.