**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID WICHTERMAN, JR., as ADMINISTRATOR of the ESTATE OF DANIEL WICHTERMAN,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CITY OF PHILADELPHIA; TEHUM CARE SERVICES, INC. (formerly known as CORIZON HEALTH); POLICE CORRECTIONAL OFFICER JUSTIN AVERY; POLICE CORRECTIONAL OFFICER WILLIAM GWALTHNEY; POLICE CORRECTIONAL OFFICER JOYNER, BADGE NO. 114; TAIRU WAHABU, RN; YITZCHAK LEFKOWITZ a/k/a ISAAC LEFKOWITZ; SARA ANN TIRSCHWELL; AYODEJI OLAWALE LADELE; BEVERLY MICHELLE RICE; JEFFREY SCOTT KING; JENNIFER LYNNE FINGER; FRANK JEFFREY SHOLEY,**<br><br>**Defendants.** | : | **CIVIL ACTION**<br><br>**No. 16-5796** |

**Plaintiff's Response in Opposition to**
**Director and Officer Defendants' Motion to Dismiss**

## I. Introduction

Daniel Wichterman died due to an opiate overdose while detained in the Philadelphia Police Department's Police Detention Unit on January 30, 2015, more than *eleven years* ago. Plaintiff David Wichterman, Jr., the administrator of Daniel Wichterman's Estate initiated this litigation in 2016. He alleged civil rights claims against the City of Philadelphia and three of its employees as well as Corizon Health and its employee, Tairu Wahabu, RN. After lengthy

discovery and summary judgment litigation, the Court (DuBois, J.) entered an Opinion allowing plaintiff to proceed to a jury trial with civil rights claims against the City of Philadelphia and negligence claims against Wahabu and Corizon. The matter was then assigned to the docket of the Honorable John Milton Younge in August 2021. The Court scheduled a final pretrial conference for February 28, 2023, ECF 108, but 12 days before that conference, counsel for Corizon informed the Court of Corizon's bankruptcy proceedings. ECF 109. The Court then stayed the case on February 17, 2023. ECF 111.

The litigation remained stayed for more than three years while the bankruptcy proceedings slowly progressed. In March 2025, the parties to the bankruptcy proceedings negotiated a resolution of the bankruptcy that was expected to result in substantial payouts to a trust that, in turn, would be distributed to wrongful death and personal injury claimants, like plaintiff in this case. This resolution was contingent upon the release of any and all claims against a number of directors and officers of Corizon and its various successor entities. To ensure that payments would be made, however, the parties agreed that any default on payment obligations would eliminate those releases. The plan expressly provided that in the event of a default, claimants like plaintiff would be permitted to pursue individualized claims against those directors and officers.

In the months that followed the bankruptcy resolution, the parties responsible for making payments into the trust defaulted on their obligations. Based on investigation and discovery conducted by, among others, the trust charged with administering wrongful death and personal injury claims, it appeared that the default on payment obligations was the result of serious misconduct on the part of several directors and officers. The trust found evidence that the directors and officers had siphoned money away from Corizon and its successor entities and into

entities over which they had exclusive control. In short, the evidence suggested that the directors and officers stole the money earmarked for distribution to hundreds of claimants around the country who had been grievously harmed as a result of inadequate medical care provided by Corizon and its employees.

On March 4, 2026, the trust filed a notice in the bankruptcy proceedings informing all intended beneficiaries of the trust that, due to the default, the beneficiaries were permitted to bring their own claims against any party released under the bankruptcy resolution. The notice instructed beneficiaries that they had a limited window of 90 days to initiate such claims. On June 1, 2026, plaintiff did exactly that, filing a motion for leave to file a Second Amended Complaint naming as defendants seven directors and officers who had previously been released from all claims as part of the now-defunct bankruptcy resolution. ECF 131. The claims asserted in the Second Amended Complaint seek to hold the directors and officers liable to plaintiff for their fraudulent conduct. The claims also seek to treat the directors and officers as the alter ego of the Corizon corporate entity that was, before the bankruptcy proceedings, responsible for the liability of its employees on a respondeat superior theory. After delays related to a motion to withdraw as counsel filed by former counsel for defendant Wahabu, on August 26, 2026, the Court granted plaintiff leave to add his claims against the director and officer defendants, ECF 138, and the Second Amended Complaint was docketed that same day. ECF 139.

Six of the newly added directors and officers have moved to dismiss the Second Amended Complaint.[1] ECF 143. They offer three overarching arguments in support of dismissal: that the Court may not exercise personal jurisdiction over them given their out-of-state residence,

---

[1] The moving defendants are Jennifer Finger, Jeffrey King, Isaac Lefkowitz, Beverly Rice, Frank Sholey, and Sara Tirschwell. The seventh defendant, Ayodeji Olawale Ladele, was served on November 19, 2026, and has yet to file a responsive pleading. ECF 145.

that plaintiff does not have standing to bring claims that may otherwise be brought by the bankruptcy trust, and that the claims fail on the merits. Most notable about the moving defendants' motion, however, is what they do not say. Nowhere in their brief do they acknowledge that they made a promise in bankruptcy proceedings to honor their financial obligations and agreed that if they failed to live up to that promise then they could be sued by the intended beneficiaries of that promise—beneficiaries who are in the exact position as plaintiff in this case. It would be an odd result if the moving defendants were able to hinge the resolution of complicated bankruptcy proceedings on assurances that claimants like plaintiff would be able to bring claims against them, only to then successfully preclude plaintiff from bringing exactly those claims.

As plaintiff demonstrates below, that result would not only be odd, but it would also run counter to the law and the facts. Each of the moving defendants' arguments fails to withstand scrutiny on the merits. First, the defendants have had sufficient contact with this jurisdiction to justify the Court's exercise of jurisdiction, and, at a minimum, plaintiff should be permitted to conduct jurisdictional discovery. Second, plaintiff has standing to bring the claims asserted in the Second Amended Complaint because they specifically target individualized harms suffered by the Estate of Daniel Wichterman. And third, the Second Amended Complaint pleads facts that plausibly support a claim of fraud and a claim that the defendants stand in the place of the former corporate defendant, Corizon, for the torts of that corporation's employees. The moving defendants' motion should be denied, and plaintiff should be permitted to proceed to discovery.

## II. Factual and Procedural History

### A. The Death of Daniel Wichterman and the Ensuing Civil Rights Litigation

In January 2015, the City of Philadelphia and its contract provider of prison medical services, Corizon Health, were well aware of an ongoing opiate epidemic. With dramatically increased usage of pills and heroin in the City throughout the preceding years, there was, the City and Corizon knew, a dramatic increase in deadly opiate overdoses. Given the close association between drug use and criminal justice involvement, it was clear the effects of the epidemic would be magnified in the City's prison and police holding cells. The City and Corizon knew there were simple steps to take to prevent overdose deaths in these facilities: making a trained nurse available; ensuring that officers recognize the signs of an overdose; requiring officers to immediately report concerns about a detainee's medical situation; and providing access to Narcan, an easy-to-administer drug that can reverse the effects of most opiate overdoses.

Indeed, by January 2015, the City and Corizon had in place what *appeared* to be appropriate measures to prevent overdose deaths. In the City's main holding facility for DUI arrestees, the Police Detention Unit ("PDU") at 8th and Race Streets, a Corizon nurse was available at all times. And the City's policy statements spelled out training requirements for employee officers and provided guidance as to when officers should seek medical intervention.

On the afternoon of January 30, 2015, Philadelphia police responded to the scene of an auto accident in Northeast Philadelphia. Officers found Daniel Wichterman in the driver's seat. Mr. Wichterman was obviously intoxicated. He was wobbly while standing, his eyes were glassy, and his pupils were constricted. He candidly admitted to the officers, without prompting, that he had been using heroin. Officers arrested him on suspicion of DUI. By 6:00 pm, Mr. Wichterman arrived at the PDU. Four hours later, Mr. Wichterman was found unresponsive in

his cell. He had no heartbeat, and he was not breathing. Paramedics were called. Their efforts to revive him were not successful, and he was taken to Hahnemann Hospital where he was pronounced dead. Shortly thereafter, an autopsy report concluded that Mr. Wichterman died from a drug overdose. He was 29 years old.

Plaintiff, David Wichterman, Jr., the brother of Daniel Wichterman and the administrator of his estate, initiated this litigation.[2] Investigation and discovery that followed showed that Daniel Wichterman's death was caused by two independent but closely related factors regarding the implementation of the above-described overdose prevention measures.

***Wahabu and Corizon***: First, shortly after his arrival in the PDU, Mr. Wichterman was seen by Corizon employee, defendant Nurse Tairu Wahabu, for a "receiving screening" and DUI blood draw. Nurse Wahabu claimed in his deposition testimony that he asked Mr. Wichterman about drug use and that Mr. Wichterman denied using any drugs. He also testified that Mr. Wichterman did not show any signs of intoxication. Had Mr. Wichterman admitted to drug use or appeared intoxicated, Wahabu claimed, he would have closely monitored Mr. Wichterman once he was sent to the PDU's cellblock. In any event, Wahabu contended, he saw Mr. Wichterman on the cellblock on two separate occasions, and, each time, Mr. Wichterman was alert and awake and there was no reason to be concerned. When Mr. Wichterman was found dead in his cell, Wahabu was shocked. Even when he testified nearly three years after the death, he said he could not explain what happened.

The evidence shows, however, that Wahabu's testimony was false in at least three critical respects: (1) based on testimony from police officers who saw Mr. Wichterman at the same time

[2] Hereinafter, plaintiff David Wichterman, Jr., is referred to as "plaintiff," and Daniel Wichterman is referred to as "Mr. Wichterman."

as did Wahabu, Mr. Wichterman presented clear and obvious signs of intoxication, (2) Wahabu never asked Mr. Wichterman whether he had used drugs meaning he never learned about his ingestion of heroin; and (3) Wahabu never once looked into Mr. Wichterman's cell. In short, Wahabu's actions prevented him from knowing and understanding Mr. Wichterman's risk of death by overdose.

***The City***: Second, the City of Philadelphia had policies requiring training of its police correctional officers ("PCOs") charged with monitoring detainees at the PDU regarding the recognition of overdose signs and the need to seek medical evaluation. The most obvious of those signs involves the inability to wake from an apparent deep sleep. Despite the requirements of this training, the evidence shows that when PCO Lavern Joyner attempted to summon Mr. Wichterman for fingerprinting and found him "knocked out" and "sleeping hard," she simply left him there. Joyner thus failed to intervene when Mr. Wichterman was in the midst of what, at that point, was a reversible overdose.

***Legal Claims*:** Based on these facts, and consistent with the Court's summary judgment ruling (ECF 55, 56), plaintiff will present to the jury two separate claims: (1) Wahabu was negligent in his interactions with Mr. Wichterman and violated the standard of care for treatment of a person in Mr. Wichterman's situation (and the individuals responsible for Corizon's liability are liable on a *respondeat superior* theory), and (2) the City's failure to train its employee PCOs, with deliberate indifference to the risks of harmful outcomes from opiate overdoses, resulted in the failure to obtain necessary medical attention for Mr. Wichterman while experiencing an overdose.

***Pretrial Proceedings***: On November 28, 2022, this Court entered an Order scheduling a final pretrial conference for February 28, 2023. ECF 108. Twelve days before that conference, on

February 16, 2023, counsel for defendants Wahabu and Corizon filed a suggestion of bankruptcy informing the Court of bankruptcy proceedings involving defendant Corizon. ECF 109. The Court then canceled the final pretrial conference and stayed all further proceedings. ECF 111. On August 18, 2023, plaintiff requested that the Court allow plaintiff to proceed to trial with his claims against the City, ECF 114, but the Court denied that request. ECF 116. No further litigation proceedings occurred for the next three years, when plaintiff sought leave to file his Second Amended Complaint.

### B. Facts Alleged in the Second Amended Complaint Against the Director and Officer Defendants

The facts alleged in the Second Amended Complaint relevant to the instant motion concern events that occurred during and in connection with the bankruptcy proceedings in *In re Tehum Care Services, Inc.*, No. 23-90086 (Bankr. S.D. Tex.), specifically, fraudulent and improper conduct by individual directors and officers of Corizon and related companies, resulting in the failure to honor obligations to claimants like plaintiff in this case. The origin of the fraudulent conduct dates to the months leading up to May 2022, when Corizon Health, Inc. undertook a significant corporate restructuring designed to insulate its profitable operations from massive liabilities. Sec. Am. Compl. (ECF 139) at ¶ 83. Corizon re-incorporated in Texas and executed a divisive merger under Texas state law. *Id.* As a result of this divisive merger, a new entity called YesCare Corp. received all of Corizon's active contracts, representing approximately $200 million in annual government payments, operational infrastructure, management personnel, and ongoing business operations. *Id.* ¶ 84. Tehum Care Services, Inc. ("Tehum") was created as a shell entity and assigned approximately $1.2 billion in liabilities. *Id.* ¶ 85. Many of those liabilities were from pending litigation concerning improper medical care provided by Corizon Health and its employees and agents at detention centers, jails, and prisons

throughout the United States. *Id.* This case concerning the Estate of Daniel Wichterman was included as a liability assigned to Tehum. *Id.* In light of those liabilities, Tehum was the entity that filed the Chapter 11 bankruptcy petition referenced above. *Id.* ¶ 86.

Throughout the bankruptcy proceedings, counsel for the trust set up to represent the interests of tort claimants, like plaintiff, discovered that a variety of directors and officers involved with Corizon and its related entities had engaged in significant misconduct. *Id.* ¶ 87. Those directors and officers include Yitzchak Lefkowitz, also known as Isaac Lefkowitz; Sara Ann Tirschwell; Ayodeji Olawale Ladele; Beverly Michelle Rice; Jeffrey Scott King; Jennifer Lynne Finger; and Frank Jeffrey Sholey (collectively "directors and officers"). *Id*. The group, led principally by Lefkowitz, siphoned money—approximately $30 million—from Corizon and into entities over which the directors and officers had exclusive or near-exclusive control. *Id.* ¶¶ 88-95.

The transfer of these funds, among multiple other transactions, directly led to a failure on the part of parties to the Tehum bankruptcy proceedings to comply with obligations under a final Chapter 11 Plan of Reorganization ("Plan"). *Id.* ¶ 97. That Plan was entered by the Bankruptcy Court on March 3, 2025. *Id.* ¶ 98; *see also In re Tehum Care Services*, No. 23-90086. ECF 2014 (Bankr. S.D. Tex.). In relevant part, the Plan provided for payments totaling $50 million to be used to resolve the claims of, among others, tort claimants like plaintiff in this matter. *Id.* ¶ 99. The Plan also implemented a "Channeling Injunction" that prohibited tort claimants from pursuing litigation against Tehum, its successors, or any individual directors and officers. *Id.* ¶ 100. The Plan specifically identified a list of "Released Parties" who could not be sued in connection with any claim brought by tort claimants, and the Released Parties identified in the Plan included each of the directors and officers named as defendants in this action. *Id.* ¶ 101.

Counsel involved in the bankruptcy proceedings for Tehum insisted that each of the directors and officers be included among the Released Parties, thereby acknowledging that, but for the protections offered in bankruptcy proceedings, these directors and officers were potentially personally responsible for Tehum's liabilities. *Id.* ¶ 102.

The Plan expressly conditioned the enforcement of the Channeling Injunction on the compliance of the Released Parties with the payment terms of the Plan. *Id.* ¶ 103. Thus, the Plan provided that if there was a default on obligations to pay the required $50 million to satisfy personal injury and wrongful death claims, the Injunction would be dissolved and tort claimants, like plaintiff in this case, would have 90 days to bring causes of action against the Released Parties. *Id.*

In late 2025, the Released Parties failed to make a payment required under the Plan. *Id.* ¶ 104. After the Released Parties were offered an opportunity to cure the failure, in February 2026, they failed to make another payment, and these failures constituted a default under the Plan. *Id.* ¶¶ 104-05. On March 4, 2026, the trustees charged with administering payments to personal injury and tort claimants, like plaintiff in this case, filed in the bankruptcy proceedings a Notice of Failure to Cure Settlement Payment Default. *Id.* ¶ 106; *In re: Tehum Care Services, Inc.*, No. 23-90086, ECF 2617 (Bk. S.D. Tx.); *see also* ECF 131-2 (notice served on plaintiff's counsel). The Notice provided the following:

- As a result of the default, all injunctions contemplated under the Plan that prevented claimants from litigating tort causes of action are terminated and void;
- All protections provided to the Released Parties are terminated;
- All claimants whose claims were addressed in the Plan are permitted to bring causes of action against the Released Parties; and

- All statutes of limitations that would apply to claims against the Released Parties are tolled for a period of 90 days from the date on which the Notice of Default was filed, that is, until June 3, 2026.

ECF 139 at ¶ 106(a)-(d).

In light of these developments, plaintiff sought leave to file a Second Amended Complaint adding claims against the directors and officers. ECF 131. In the Second Amended Complaint, plaintiff asserted three claims against the seven director and officer defendants: (1) fraud, ECF 139 at ¶¶ 127-31; (2) liability under the alter ego and piercing of the corporate veil doctrines, *id.* ¶¶ 132-25; and (3) respondeat superior liability for the negligence of defendant Wahabu, *id.* ¶ 126.[3] The Court permitted the docketing of the Second Amended Complaint on August 26, 2026, ECF 138, and it was docketed the same day. ECF 139.[4]

After service of process on the newly added defendants, six of the directors and officers filed the instant motion to dismiss. The Court has scheduled a Rule 16 conference for December 15, 2026. ECF 142.

## III. Standards of Review

The moving defendants seek dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), and for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).

---

[3] As outlined further below, the alter ego/veil piercing claim is not an independent claim for relief, but rather a basis for liability on the negligence claim brought against the Corizon employees.

[4] After the motion was filed, the Court held a hearing on June 10, 2026, to address a separate motion filed by counsel for the Corizon defendants to withdraw from representation, which motion the Court granted. ECF 138.

*Rule 12(b)(1)*

Motions seeking relief under Rule 12(b)(1) "may be treated as either a facial or factual challenge to the court's subject matter jurisdiction." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Id.* When evaluating "a factual attack, the court may consider evidence outside the pleadings." *Id.* Courts addressing factual challenges need not accept all allegations as true, but they must employ "a relaxed standard of proof for the jurisdictional question where jurisdiction is intertwined with the merits." *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 344 (3d Cir. 2012). This is to "ensure" that courts "do not prematurely grant Rule 12(b)(1) motions to dismiss claims in which jurisdiction is intertwined with the merits and could be established, along with the merits, given the benefit of discovery." *Id.* (quoting *CNA v. United States*, 535 F.3d 132, 145 (3d Cir. 2008)).

*Rule 12(b)(2)*

Though plaintiffs "bear[] the burden of establishing" personal jurisdiction over defendants when challenged under Rule 12(b)(2), they "need only establish a prima facie case of personal jurisdiction and . . . [are] entitled to have [their] allegations taken as true and all factual disputes drawn in [their] favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)). "[C]ourts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (quoting *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997)). "If a plaintiff presents factual allegations that suggest 'with reasonable particularity'

the possible existence of the requisite contacts between the party and the forum state, the plaintiff's right to conduct jurisdictional discovery should be sustained." *Id.* (cleaned up).

*Rule 12(b)(6)*

Defendants cannot prevail on a motion to dismiss under Rule 12(b)(6) if the "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In conducting the Rule 12(b)(6) inquiry, courts must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the [plaintiff]." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014) (cleaned up). Significantly, "the plausibility standard does not impose a heightened pleading requirement" or require a plaintiff to "plead specific facts beyond those necessary to state a valid claim." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347-48 (3d Cir. 2016) (cleaned up). Rather, "at this early stage of the proceedings, it is enough for [plaintiff] to allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016).

## IV. Argument

### A. This Court Has Personal Jurisdiction Over the Director and Officer Defendants.

"A federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state." *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) (quoting *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 436 (3d Cir. 1987)). Pennsylvania law provides for personal jurisdiction "based on the most minimum contact with [Pennsylvania]

allowed under the Constitution of the United States." *Id.* (citing 42 Pa. C.S.A. § 5322(b)). Under the Due Process Clause, personal jurisdiction is properly exercised where a defendant has sufficient minimum contacts with the forum, and where doing so "would comport with traditional notions of fair play and substantial justice." *IMO Industries, Inc., v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998).

There are two tests for specific jurisdiction. Under the traditional test, a defendant has the requisite minimum contacts with a forum if they purposefully directed their activities at the forum and the litigation arises out of or relates to at least one of those activities. *Hasson v. FullStory, Inc*, 114 F.4th 181, 186 (3d Cir. 2024). Where a defendant has committed an intentional tort outside of the forum but the effects are felt inside the forum, minimum contacts can be established if the plaintiff establishes that he "felt the brunt of the harm in the forum" and "the defendant expressly aimed his tortious conduct at the forum." *Id.* at 187.

The traditional specific jurisdiction analysis supports this Court's exercise of jurisdiction over the defendants with respect to plaintiff's negligence claim (Count III). Plaintiff has adequately pled the director and officer defendants' minimum contacts with Pennsylvania. The Second Amended Complaint alleges that these defendants purposefully directed their activities at Pennsylvania when they contracted with the City of Philadelphia to provide medical services to its jails. ECF 139 at ¶¶ 8, 13-19. This Court can reasonably infer that negotiations leading to the execution of this contract, as well as the execution of the contract itself, involved communications, visits, payments, and other contacts between these defendants and Pennsylvania.[5] Plaintiff's negligence claim also relates to these activities. Per defendants'

---

[5] To the extent the Court does not deem it reasonable to infer these contacts or otherwise determines that plaintiff has not adequately pled the existence of this contract, plaintiff requests leave to supplement his pleadings regarding information recently obtained concerning contracts

contract with the City of Philadelphia, it was a Corizon employee working at the Philadelphia detention facility where Wichterman died who failed to monitor and assess Wichterman, which ultimately led to his death. *Id.* ¶¶ 44-50.

Plaintiff has also adequately pled the director and officer defendants' minimum contacts with Pennsylvania with respect to his fraud claim (Count IV). Plaintiff pled an intentional tort committed by these defendants: they are alleged to have personally participated in, directed, and/or facilitated a fraudulent corporate restructuring and transfer of funds, acting willfully and with the specific intent to deprive plaintiff and similarly situated claimants of the ability to recover for injuries caused by Corizon's actions and inactions. ECF No. 139 ¶¶ 127-31. Plaintiff felt the brunt of the harm in Pennsylvania. The claim that defendants have fraudulently attempted to avoid any obligation to ensure plaintiff's compensation is a Pennsylvania claim, held by a Pennsylvania estate, arising from inadequate care delivered in a detention facility located in Pennsylvania to a Pennsylvania resident. The conduct was also expressly aimed here in Pennsylvania. The assets moved to YesCare comprised all of Corizon's active contracts, which included the Philadelphia contract under which Wichterman was injured. *Id.* ¶ 84. This case was included among the liabilities assigned to shell company Tehum. *Id.* ¶ 85. These facts are more than sufficient to establish the defendants' minimum contacts with Pennsylvania.

---

with the City of Philadelphia personally signed by defendants Lefkowitz, Sholey, Tirschwell, and King. Alternatively, plaintiff requests the opportunity to conduct jurisdictional discovery to explore these contacts further. *See Toys "R" Us*, 318 F.3d at 456. Indeed, in two similar cases pending in this Court, the Honorable Gerald Austin McHugh has directed the parties to engage in jurisdictional discovery to allow for the development of a fuller record on the jurisdictional defenses raised by the moving defendants here. *See Hayes v. City of Philadelphia*, No. 22-3395, ECF 63 (E.D. Pa. Nov. 2, 2006); *Barrow v. City of Philadelphia*, No. 22-3322, ECF 51 (E.D. Pa. Nov. 2, 2006).

Defendants rely on *Walden v. Fiore*, 571 U.S. 277 (2014), and *Hasson*, 114 F.4th at 186, but unlike the defendants in those cases, they did not merely happen to injure a forum resident. Rather, they deliberately reached into Pennsylvania and entered into a contract with a Pennsylvania municipality to provide medical care to Pennsylvania residents. ECF 139 at ¶ 8. They then extracted that contract for the benefit of their surviving company (YesCare) and left an Eastern District of Pennsylvania lawsuit related to that contract behind in a shell entity (Tehum) with no means to satisfy it after engaging in a fraudulent series of transfers for the purpose of avoiding their obligations under the Corizon bankruptcy plan.

Defendants further suggest that contacts attributable to Corizon or YesCare cannot be imputed to them. ECF 143 at ECF p. 19. This Court need not impute anything, as plaintiff's allegations concern defendants' own conduct in his fraud claim. A "corporate agent may be held personally liable for torts committed in their corporate capacity." *Elbeco Inc. v. Estrella de Plato, Corp.*, 989 F. Supp. 669, 676 (E.D. Pa. 1997). Federal courts have exercised personal jurisdiction under these circumstances to prevent corporate defendants from "us[ing] a corporate shield to protect [themselves] from suit in the forum." *Id.* Whether a corporate officer will be subject to personal jurisdiction turns on the officer's role in the corporate structure, the quality of the officer's contacts, and the extent and nature of the officer's participation in the alleged tortious conduct. *Id.* at 676; *Bowers v. NETI Techs., Inc.*, 690 F. Supp. 349, 357 (E.D. Pa. 1988); *TJS Brokerage & Co. v. Mahoney*, 940 F. Supp. 784, 789 (E.D. Pa. 1996). The Second Amended Complaint pleads that the officer and director defendants all served in executive decision-making roles at Corizon and its successor company YesCare during the relevant period, ECF 139 at ¶¶ 88-95, and references each defendant's regular business conducted in Philadelphia through their companies' provision of medical services to incarcerated people there, *id.* ¶¶ 13-19. It further

details their direct participation in the fraudulent scheme to avoid obligations entered into as part of the Corizon bankruptcy proceedings by pleading that these defendants undercapitalized Tehum Care Services by assigning it $1.2 billion in liabilities with essentially no assets, *id.* ¶ 85; that Lefkowitz removed $24.5 million from Corizon and its successors and had those funds placed in accounts held by another entity that had no employees and was controlled by himself and another person, *id.* ¶ 88; that Lefkowitz, aided by Sholey, removed more than $5 million from Corizon to pay for a "consulting agreement" to another company controlled by a third company run by Lefkowitz, *id.* ¶ 89; and that each of the other defendant officers and directors was aware of and aided and abetted these transactions, *id.* ¶¶ 90-96.[6]

Alternatively, this Court can exercise alter ego general personal jurisdiction over these defendants. *See Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780-81 (3d Cir. 2018). Under Pennsylvania law, an out-of-state corporation like Corizon "'may not do business in [Pennsylvania] until it registers with' the Department of State." *Mallory v. Norfolk Southern Railway*, 600 U.S. 122, 134 (2023) (quoting 15 Pa. C.S. § 411(a)). Pennsylvania law also permits Pennsylvania courts to "'exercise general personal jurisdiction' over a registered foreign corporation[.]" *Id.* (quoting 42 Pa. C.S. 5301(a)(2)(i)). It can be reasonably inferred that, to enter into the contract with the City of Philadelphia, Corizon had to register with the Pennsylvania Department of State, which would allow this Court to exercise general personal jurisdiction over Corizon. And because the Second Amended Complaint "paint[s] a plausible picture of control"

[6] If the Court concludes the present record is insufficient to establish personal jurisdiction over the director and officer defendants, but not frivolous, the remedy is discovery, not dismissal. *Toys "R" Us, Inc.*, 318 F.3d at 456. Every fact bearing on where these defendants directed their conduct, including what they knew about the contract with the City of Philadelphia and this lawsuit when they allocated assets and liabilities and engaged in the conduct described in the Second Amended Complaint is in defendants' possession.

by the director and officer defendants over Corizon and its successor entities in light of their intermingling of corporate and personal funds,[7] this Court may exercise general personal jurisdiction over those defendants under an alter ego theory.[8] *Shuker*, 885 F.3d at 781.

**B. Plaintiff Has Standing to Pursue Individualized Claims Against the Director and Officer Defendants.**

The moving defendants contend that plaintiff cannot bring claims against them because those claims belong exclusively to the trusts established in the bankruptcy proceedings. ECF 143 at ECF pp. 20-24. Their argument fails for two reasons: first, the claims are fully consistent with those the moving defendants agreed that claimants in plaintiff's position could pursue and, second, the claims are legally appropriate under Third Circuit precedents authorizing the pursuit of claims connected to a bankruptcy proceeding.

As to the first point, the resolution of the bankruptcy proceedings was predicated on a straightforward promise: funds would be paid into a trust in return for a release of all claims against a specifically enumerated list of individuals.[9] The agreement for a release meant that holders of "channeled claims" could not bring any claims outside of the bankruptcy proceedings and were specifically enjoined from doing so. A channeled claim is one brought by, among others, a wrongful death claimant who did not opt out of the opportunity to submit a claim to the

---

[7] For a discussion of the facts giving rise to this veil-piercing theory, *see* Section C.2, *infra*.

[8] At minimum, this Court should allow "limited jurisdictional discovery to explore" this theory of general personal jurisdiction. *Shuker*, 885 F.3d at 780; *see also supra* notes 5-6.

[9] The resolution plan defined "Released Parties" to include each of the seven director and officer defendants named in plaintiff's Second Amended Complaint. *See In re Tehum Care Servs., Inc.*, No. 23-90086, ECF 2014 at ECF p. 76 ¶ 175 (Bankr. S.D. Tex. March 3, 2025) (defining "Released Parties" to include, among others "(s) Yitzchak Lefkowitz a/k/a Isaac Lefkowitz; (t) Sara Ann Tirschwell; (u) Ayodeji Olawale Ladele; (v) Beverly Michelle Rice; (w) Jeffrey Scott King; (x) Jennifer Lynne Finger; (y) Frank Jeffrey Sholey").

bankruptcy trust. *In re: Tehum Care Services*, No. 23-90086, ECF 2014 at ECF p. 65, ¶¶ 19-24 (Bankr. S.D. Tex. March 3, 2025) ("Chapter 11 Plan"). Plaintiff has a wrongful death claim and did not opt out of the claim submission process, so plaintiff's claim was "channeled."

The benefit of the bargain obtained by released parties (i.e., that they would not be sued by claimants like plaintiff) was taken off the table, however, as soon as a payment default occurred. Though moving defendants quote from a portion of the resolution plan, ECF 143 at ECF p. 23, they neglect to quote another critical portion of that plan:

> 5. **Termination of Channeling Injunction**
>
> **The Channeling Injunction and all protections afforded to the Released Parties set forth in this Article IX.I shall terminate automatically (or not take effect) as to the Holder of any Channeled Claims if a Settlement Payment Default occurs and is not cured within Settlement Payment Cure Period or waived by both the PI/WD Trustee and GUC Trustee in accord with Article IV.B.2, or if the Estate Release or the Consensual Claimant Release become void under Article IV.B.7, Article IV.B.9 or Article IV.B.12.**

Chapter 11 Plan at ECF p. 114.

Once the injunction was lifted following a default, the plan provided that claimants with previously channeled claims would be given a narrow, 90-day window in which to bring claims against released parties:

> 6. **Tolling of Statute of Limitations**
>
> **While the Channeling Injunction is in effect as to any Channeled Claim, and for ninety (90) days following the termination of the Channeling Injunction under Article IX.I.5, the running of any relevant Statute of Limitations shall be tolled as to any Channeled Claim. Upon the termination of the Channeling Injunction, the PI/WD Trustee and the GUC Trustee shall file a notice on the docket of the Chapter 11 Case and provide notice to beneficiaries of the Trusts that the Estate Party Settlement did not become effective and that such beneficiaries have ninety (90) days from the date of termination to commence Causes of Action against the Released Parties.**

*Id.* Notice of the lifting of the injunction and the limited window of opportunity to initiate claims was filed on the docket in bankruptcy proceedings, *In re Tehum Care Servs., Inc.*, No. 23-90086, ECF 2617 (Bankr. S.D. Tex. March 4, 2026), and was sent in hard copy to counsel for plaintiff. ECF 131-2. As noted, plaintiff promptly followed suit by initiating claims against the director and officer defendants by seeking leave to file a Second Amended Complaint on June 1, 2026.

By filing these claims, plaintiff has done exactly what the moving defendants agreed plaintiff would be permitted to do in the event they defaulted on their obligations. Moving defendants may not, therefore, bar plaintiff from even initiating such claims in the first instance.[10]

Beyond the fact that the moving defendants agreed that these claims could be brought, their standing argument fails for a second reason in that the claims are consistent with those the Third Circuit has allowed individual creditors to bring. As the Court recently explained, "claims are personal to creditors when the theory of liability is based on a particularized injury directly traceable to the conduct of the defendant." *In re Whittaker Clark & Daniels Inc.*, 176 F.4th 241, 269 (3d Cir. 2026) (citing *In re Wilton Armetale, Inc.*, 968 F.3d 273, 283 (3d Cir. 2020); *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014)). Moving defendants assert that the claims plaintiff has brought can only be brought by the bankruptcy trust, but that would only be the case "if the theory of liability is…based on an injury to the debtor corporation that resulted in secondary harm to all creditors." *Id.*

Plaintiff's claims cite a specific and particularized injury traceable to the conduct of the moving defendants. The core of plaintiff's claims against the director and officer defendants is that "the failure of the director and officer defendants to comply with their obligations under the Plan…deprived plaintiff of recoveries due under the Plan" and that this harm was caused "by the efforts of the director and officer defendants, led by Lefkowitz, to siphon money—at least $30

---

[10] Defendants contend that the recent order entered by the Honorable John F. Murphy in *DeLoatch v. City of Philadelphia*, No. 22-1521, ECF 92 (E.D. Pa. Nov. 13, 2026), conclusively supports its point that a plaintiff in the position of plaintiff in this case cannot bring claims that belong to the bankruptcy estate. ECF 144. But the order in *DeLoatch* does not consider what plaintiff has outlined above: that the moving defendants in this case specifically bargained for an agreement that would allow individual plaintiffs to bring claims exactly like those asserted in this action.

million—away from Corizon and into entities over which they had exclusive or near-exclusive control." ECF 139 at ¶ 109.[11] These are exactly the types of claims that may be asserted outside of bankruptcy proceedings.

The decision in *Kaiser v. Gualtieri*, No. 8:19-0449, ECF 389 (M.D. Fla. Aug. 24, 2026), cited by defendants, ECF 143 at ECF p. 21, is not to the contrary. Though the decision noted that claims similar in nature to those brought by plaintiff here could be addressed in the bankruptcy proceedings in the Southern District of Texas, it did so while addressing a distinguishable procedural posture: whether leave to amend to add claims against director and officer defendants was permissible in the first instance. The court denied amendment on the ground that the complaint would constitute the fifth amended pleading in long-running litigation. The court's discussion of the fact that claims could be addressed in another forum is not a ruling on the merits that the claims *had* to be brought in that forum, but, rather, a basis for the court's conclusion that denial of leave to amend would not substantially prejudice the plaintiff. Thus, far from establishing a legal rule requiring dismissal of claims on standing grounds as moving defendants appear to characterize it, the ruling is merely a procedural decision based on the unique history of that litigation.

In this case, because plaintiff's claims are consistent with the agreement reached by the released parties in the bankruptcy proceedings and because they proceed on theories permissible under Third Circuit law, plaintiff has standing to proceed with the claims asserted in the Amended Complaint.

---

[11] Defendants mischaracterize the factual underpinning of plaintiff's claims by suggesting that plaintiff is only challenging the lawfully authorized two-step bankruptcy filing. They fail to recognize that it is not the permissible restructuring that is at issue, but, rather, the theft of extensive assets for personal gain.

### C. The Amended Complaint States Plausible Claims Against the Moving Defendants.

#### 1. Plaintiff States Facts Supporting a Fraud Claim Under the Pennsylvania Uniform Voidable Transactions Act

Corporate officers are individually liable for the torts they personally commit and cannot shield themselves behind a corporation when they are actual participants in the tort. *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978). Pennsylvania law distinguishes between liability for individual participation in a wrongful act and liability imposed by disregarding a sham corporation, and it imposes the former on the participant as an actor rather than as an owner. *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 89, 90 (Pa. 1983); *Brindley v. Woodland Vill. Rest., Inc.*, 652 A.2d 865, 867 (Pa. Super. 1995). Count IV in the Amended Complaint pleads that theory. ECF 139 at ¶¶ 127-31. Defendants' argument that they acted only in corporate capacities is not a defense to those allegations.

Defendants argue that the Pennsylvania Uniform Voidable Transactions Act reaches only debtors and transferees. ECF 143 at ECF pp. 26-27. The statute provides otherwise; judgment may be recovered against the first transferee of the asset *or* "the person for whose *benefit* the transfer was made." 12 Pa. C.S. § 5108(b)(1)(i) (emphasis added). Whether each director and officer defendant falls within that provision is a fact question. The Second Amended Complaint alleges that transfers were made for the benefit of these defendants. More specifically, it pleads that Lefkowitz was one of only two directors of the entity to which approximately $24.5 million was transferred, ECF 139 at ¶ 88; that Lefkowitz orchestrated the payment of $5.5 million to a company he ultimately controlled, *id.* ¶ 89; that Sholey executed the $5.5 million payment, *id.* ¶ 90; and that Sholey and the other director and officer defendants obtained top executive positions at the entity that received the operating business, *id.* ¶¶ 90-95.

Rule 9(b) requires notice of the precise misconduct alleged. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). A plaintiff satisfies it by pleading date, place, or time, or by any alternative means that injects precision and some measure of substantiation. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). The Second Amended Complaint pleads Lefkowitz's execution of the December 2021 consulting agreement, ECF 139 at ¶ 88; names the person who directed the transfers and the officers who executed them, *id.* ¶ 89; two categories of transfers with amounts, being approximately $24.5 million from Corizon to M2 LoanCo, approximately $5.5 million from Corizon to Geneva Consulting; and the February 2023 bankruptcy petition, *id.* ¶ 88. That is more precision than Rule 9(b) demands. To the extent greater detail rests in defendants' own files, the requirement is relaxed. *Rockefeller*, 311 F.3d at 216; *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989).

Defendants argue that Count IV fails because it alleges no misrepresentation to plaintiff and no reliance by him. ECF 143 at ECF pp. 27-28. But plaintiff has not brought a common law fraud claim,[12] and a claim under section 5104(a)(1) requires only actual intent to hinder, delay, or defraud a creditor; it requires no misrepresentation to the creditor and no reliance by the creditor. The Second Amended Complaint adequately pleads various factors demonstrating intent as outlined in section 5104(b) of the act: transfer to an insider, retention of control, the pendency of suit, transfer of substantially all assets, and insolvency.

Defendants' request to dismiss the fraud claim in Count IV, therefore, fails.

---

[12] For this reason, defendants' reliance on *Marshall v. Fenstermacher*, 388 F. Supp. 2d 536 (E.D. Pa. 2005), is misplaced.

### 2. Plaintiff States Facts Supporting Piercing of the Corporate Veil to Hold the Moving Defendants Liable for the Negligence of the Individual Medical Defendant.

The moving defendants treat plaintiff's pleading regarding veil piercing and a negligence claim separately, ECF 143 at ECF pp. 24-26, 28-31, but the facts alleged regarding these concepts are closely intertwined. Specifically, plaintiff alleges that the defendants are liable for negligence on a respondeat superior theory specifically *because* the corporate veil should be pierced.

Defendants argue that veil piercing is not an independent cause of action, and they are correct on that point. However, as courts have regularly held, the legal accuracy of this position is not a basis for dismissal of a veil piercing theory. *See Seven Springs Mountain Resort, Inc. on behalf of Sikirica v. Hess*, No. 3:21-0006, 2022 WL 1004178, at *11 (W.D. Pa. Apr. 4, 2022) ("The parties do not dispute that veil piercing is an equitable remedy, and while Plaintiff may have improperly styled its veil piercing claims as independent causes of action…Plaintiff has sufficiently alleged facts in support of its veil piercing requests."). In order for the equitable remedy of veil piercing to apply, a plaintiff may allege facts regarding a number of types of misconduct by corporate officers and directors, including "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud." *Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 509 (E.D. Pa. 2014) (citing *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995)). Once such facts are alleged, then veil piercing "is a means of imposing liability established in an underlying cause of action." *Seven Springs Mountain Resort*, 2022 WL 1004178, at *10 (quoting *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1035 (Pa. 2018)).

Plaintiff's pleading meets the relevant standards, at this stage of the case, for proceeding with a veil piercing theory. The Second Amended Complaint pleads that the director and officer defendants undercapitalized Tehum Care Services by assigning it $1.2 billion in liabilities with essentially no assets. ECF 139 at ¶ 85. After the divisive merger that resulted in Tehum taking on those liabilities, the director and officer defendants, led by Lefkowitz, engaged in a pattern of conduct that intermingled corporate and personal affairs and perpetrated a fraud. In one transaction engineered by Lefkowitz, the defendants removed $24.5 million from Corizon and its successors and had those funds placed in accounts held by another entity that had no employees and was controlled by Lefkowitz and another person. In another transaction, Lefkowitz, aided by Sholey, removed more than $5 million from Corizon to pay for a "consulting agreement" to another company controlled by a third company run by Lefkowitz. Each of the other defendant officers and directors was aware of and aided and abetted these transactions. As a result of these transactions, there were no funds available to fulfill the obligations entered into as part of the Corizon bankruptcy proceedings.

These facts are sufficient to allow plaintiff to proceed with a veil piercing theory and to, at a minimum, conduct discovery in support of that theory.[13] Should plaintiff establish a record in support of that theory, the director and officer defendants will stand in place of the former corporate defendant, Corizon, and be liable on a respondeat superior theory for the torts of Corizon's employees–that is, they will be liable for plaintiff's "underlying cause of action."

---

[13] As noted above, should the Court determine that personal jurisdiction has not been established over the director and officer defendants, the Court may authorize jurisdictional discovery to address an "alter ego theory of general personal jurisdiction." *Shuker*, 885 F.3d at 780-81.

*Seven Springs Mountain Resort*, 2022 WL 1004178, at *10.[14] The motion to dismiss the veil piercing theory and the negligence claim should, therefore, be denied.

**V. Conclusion**

For the foregoing reasons, the directors and officers' motion to dismiss all claims in the Second Amended Complaint brought against them should be denied.

Respectfully submitted,

/s/ *Jonathan H. Feinberg*
Jonathan H. Feinberg
KAIRYS, RUDOVSKY, MESSING
FEINBERG & LIN LLP
718 Arch Street, Suite 501 South
Philadelphia, PA 19106

*Counsel for Plaintiff David Wichterman, Jr.*

[14] Accordingly, the moving defendants' arguments that they had no employer-employee relationship with the individual Corizon defendants or that they had no supervisory responsibility over those employees, ECF 143 at ECF pp. 28-29, have no relevance here.